**FORT WASHINGTON RESOURCES, INC., Plaintiff,**

v.

**Robert H. TANNEN, Ph.D., Defendant/Counterclaimant,**

v.

**Kirk PENDLETON, Counterclaim defendant,**

and

**Fort Washington Resources, Inc., Counterclaim defendant.**

No. 93–CV–2415.

United States District Court, E.D. Pennsylvania.

Oct. 5, 1995.

plaintiff is Fort Washington Resources, Inc. ("FWR"), a Pennsylvania company that seeks damages for breach of contract, negligent performance of professional services, intentional interference with a prospective business advantage, and conversion. The defendant, Dr. Robert H. Tannen, has responded with a counterclaim against FWR and its Chief Executive Officer, Kirk Pendleton, under four theories of liability: (1) fraudulent misrepresentation, (2) negligent misrepresentation, (3) defamation, and (4) breach of contract. In a previous Memorandum and Order, we awarded summary judgment to FWR regarding its conversion claim. Moreover, we granted summary judgment in favor of Dr. Tannen with respect to FWR's claim for intentional interference with a prospective business advantage. *See Fort Washington Resources, Inc. v. Tannen,* 846 F.Supp. 354 (E.D.Pa.1994). Thus, we are left to consider the remaining claims. The parties have submitted their proposed findings of fact and conclusions of law and the matter is now ripe for decision. Accordingly, the Court makes the following factual findings and legal conclusions.

### FINDINGS OF FACT

1. FWR is a company that was formed for the purpose of developing and marketing flausterone, a drug which has demonstrated great promise in the treatment of a variety of serious maladies, including diabetes and cancer. Tr., 9/19/94, pp. 34–36; 9/23/94, p. 10.

2. FWR's key personnel include the following:

(1) Kirk Pendleton. Mr. Pendleton is a shareholder and investor who acted as FWR's chairman of the board during the time when the events giving rise to this lawsuit occurred. Tr., 9/19/94, p. 33.

(2) James Saltzman. Mr. Saltzman was an investor and shareholder of FWR who became a director of the company in the fall of 1993. Tr., 9/23/94, pp. 21, 90–91.

(3) Arthur Schwartz, Ph.D. During the relevant time period, Dr. Schwartz was a professor at the Temple University Medical School in Philadelphia. Dr. Schwartz has been working to develop flausterone since

Allan C. Preziosi, David F. Gould, III, Lightman & Associates, Philadelphia, PA, for Fort Washington and Kirk Pendleton.

Laurence I. Tomar, Elizabeth A. Hunter, Law Office of Laurence I. Tomar, Yardley, PA, for Robert H. Tannen.

### DECISION

JOYNER, District Judge.

### DECISION

This diversity case was tried before this Court in a non-jury trial on September 19–23, 1994 and November 14–17, 1994. The

1975, and is the man chiefly responsible for its invention. Tr., 11/14/94, pp. 2–3. Dr. Schwartz served as chief scientist for FWR and was one of its shareholders. Tr., 11/14/94, pp. 12, 135.

(4) Abraham Bavely, Ph.D. Dr. Bavely worked for Resource Technologies Corporation ("RTC") until 1982. In this capacity, Dr. Bavely would travel to the many universities with whom RTC had a relationship and discuss the substance of the ongoing research with the resident scientists, with an eye toward securing a patent for worthy discoveries. In 1978, Dr. Bavely became associated with Dr. Schwartz. Tr., 11/16/94, pp. 17, 20. He became involved with FWR in 1985 and was a shareholder. Tr., 11/16/94, p. 38.

(5) Robert Tannen, Ph.D. Dr. Tannen, the defendant and counterclaimant, became associated with Dr. Schwartz and flausterone in the early 1980's while completing a postdoctoral fellowship at the Fels Research Institute in Philadelphia. Tr., 11/15/94, p. 166. Dr. Tannen subsequently assumed a position in the private sector, but remained in touch with Dr. Schwartz and repeatedly voiced his desire to work on the flausterone project. Tr., 11/15/94, pp. 166, 170. FWR hired Dr. Tannen in 1992. Tr., 11/15/94, p. 197–98.

(6) Robert B. Kaskey. Mr. Kaskey became associated with FWR in the mid–1980's and served as the leader of the company until his resignation in February of 1991. Tr., 11/15/94, pp. 88, 102–03.

3. In 1989, FWR acquired a license from RTC to develop flausterone. Tr., 9/19/94, pp. 46, 51.

4. Under the terms of the licensing agreement, FWR was obliged to develop the drug and file an Investigational New Drug ("IND") application with the Food and Drug Administration ("FDA"). Tr., 9/19/94, p. 52.

5. Temple University and RTC were entitled to advance royalty payments pursuant to the licensing agreement. RTC elected to waive its royalty payments in favor of stock. Tr., 9/20/94, pp. 33–34. Temple, on the other hand, demanded that its royalty payments be made in cash. Thus, in March of 1993, FWR agreed that it would make a $100,000 payment to Temple in June of 1993 and an additional $360,000 payment by the end of that year. Tr., 9/20/94, pp. 34–35.

6. In the event that FWR failed to file the IND with the FDA, FWR would lose the license, and therefore its reason for existence and value. Tr., 9/23/94, p. 56.

7. In order to maintain the license, FWR was required to submit the IND application by April 15, 1993. Tr., 9/19/94, p. 79. There was a general understanding that RTC would extend the filing deadline if FWR could demonstrate that it was working diligently to advance the process. Tr., 11/16/94, p. 30.

8. In the late winter of 1992, FWR initiated a search for a consultant to complete the IND application. FWR's interest settled on Dr. Tannen. Tr., 9/19/94, p. 71.

9. Dr. Tannen had expressed considerable interest in the project during its initial stages, and had acquired considerable knowledge of flausterone through discussions with Dr. Schwartz. Tr., 9/19/94, p. 77.

10. In May of 1992, Mr. Pendleton interviewed Dr. Tannen for the position. Although Dr. Tannen had never prepared or filed an IND application previously, he assured Mr. Pendleton that he possessed sufficient experience to complete the IND application in a timely fashion. Tr., 9/19/94, p. 77.

11. Mr. Pendleton asked whether Dr. Tannen could complete the IND application by the April 15, 1993 deadline. Dr. Tannen replied that he could complete the task within four to six months. Tr., 9/19/94, pp. 77, 79; 11/15/94, pp. 195–96.

12. FWR agreed to hire Dr. Tannen as a consultant for the four to six month period in which the IND application would be assembled and filed. Dr. Tannen was promised a salary of $100,000 per year. Dr. Tannen was also promised stock in the event that the IND filing was successful. Tr., 9/19/94, pp. 77–78; 11/15/94, pp. 183, 196–98.

13. The parties never executed a written employment contract. Mr. Pendleton did, however, memorialize the meeting in a letter, which he addressed to Dr. Tannen. The letter reads, in pertinent part, as follows:

By this letter I confirm the Fort Washington Resources Inc. (FWR) offer for you to

consult for a six-month period of time in the area of IND preparation and filing. Your compensation for this work will be $50,000 payable in six equal payments of $8,333.33. In addition you will be reimbursed for all approved out-of-pocket expenses.

Should the IND filing be successful and we mutually agree to continue a relationship, it is our intent to offer you a position as an employee of Fort Washington Resources on terms and conditions satisfactory to both parties. One of these conditions would be your participation in a stock option program which will be presented for approval in the future.

Defendant's Ex. 5.

14. Dr. Tannen argued at trial that the letter did not fully represent the terms of their agreement, yet he concedes that he never expressed to Mr. Pendleton his dissatisfaction with the terms set forth in the letter. Tr., 11/15/94, p. 200.

15. Dr. Tannen was hired and began working in June of 1992. Tr., 9/19/94, p. 90.

16. When Dr. Tannen began working, he was under the impression that the IND preparation would be an "assembly job;" that is, Dr. Tannen would assemble pre-existing documents, summarize laboratory notebooks, and write clinical reports based upon data that had previously been compiled. Tr., 11/17/94, p. 48.

17. By October, Dr. Tannen realized that the filing of the IND would require more than just assembly, and that additional formulation work was required before the IND application could be submitted. Tr., 11/17/94, p. 48.

18. Dr. Tannen prepared periodic time and event schedules to update his progress regarding the completion of the IND filing. The first such time and event schedule was submitted on July 15, 1992. The projected IND filing date was December of 1992. Tr., 9/19/94, p. 99; Plaintiff's Ex. 6.

19. Dr. Tannen submitted a second time and event schedule on August 6, 1992, indicating that the IND would be completed by January, 1993. Tr., 9/19/94, p. 100; Plaintiff's Ex. 7.

20. The third time and event schedule, submitted on October 15, 1992, indicated that the IND application would be completed by March of 1993, one month prior to the April 15 deadline. Tr., 9/19/94, pp. 114–15; Plaintiff's Ex. 8.

21. At a progress meeting convened on October 28, 1992, Dr. Tannen assured FWR that the April 15 deadline would be met. Tr., 9/19/94, p. 107.

22. Another progress meeting was convened on January 6, 1993. Dr. Tannen submitted a fourth time and event schedule, in which he indicated that the IND application would be completed by April, 1993. Tr., 9/19/94, pp. 114–15; Plaintiff's Ex. 9.

23. Mr. Pendleton expressed his concern that the IND application deadline date would not be met, but Dr. Tannen again gave his assurance that the application would be filed by April 15. Tr., 9/19/94, p. 126.

24. On or about March 1, 1993, Mr. Pendleton contacted Dr. Tannen to inquire about the status of the IND application. Dr. Tannen was unsure as to whether he could complete it by April 15, but informed Mr. Pendleton that he could certainly accomplish the task by May. Tr., 9/19/94, pp. 127–28.

25. Mr. Pendleton asked Dr. Tannen to be quite specific, because he believed FWR could obtain a brief extension of the deadline date from RTC as long as the IND was close to completion and that the date of completion could be set with reasonable accuracy. Dr. Tannen indicated that he could finish the task by May. Tr., 9/19/94, p. 128.

26. At a March 11, 1993 progress meeting, ten days after he assured Mr. Pendleton that the work would be completed by May, Dr. Tannen submitted a time and event schedule in which he indicated that the IND application would not be completed until August of 1993. Tr., 9/19/94, p. 127.

27. Mr. Pendleton thereafter requested that Dr. Tannen attend a meeting with FWR officers and with Hanni Ellis, a woman with significant experience in the completion of INDs, so that they might develop a course of action to complete the IND application. Dr.

Tannen refused to attend the meeting. Tr., 9/19/94, pp. 136–37.

28. On March 22, 1993, Mr. Pendleton asked Dr. Tannen to turn in his work product, so that Mr. Pendleton might show it to Ms. Ellis. Dr. Tannen refused to submit the work product and refused to meet with Ms. Ellis. Tr., 9/19/94, p. 138; Plaintiff's Ex. 13.

29. By letter dated April 2, 1993, FWR notified Dr. Tannen that he had been relieved of his duties after he refused to return his work product to FWR. Tr., 9/19/94, pp. 141–42; Plaintiff's Ex. 14.

30. Dr. Tannen possessed neither the knowledge nor the professional experience necessary to complete the IND application. Plaintiff's Ex. 15.

31. Dr. Tannen never completed, and in many cases never initiated, the vast majority of tasks required to prepare and submit an IND application. Plaintiff's Ex. 15.

32. Following Dr. Tannen's termination, RTC extended the IND deadline date to January 1, 1994. Defendant's Ex. 64.

33. Dr. Tannen continued to refuse to return the work product supporting the IND application, prompting FWR to file suit. This Court subsequently ordered Dr. Tannen to turn the documents over to FWR. The documents were returned to FWR by April of 1994. Tr., 9/19/94, pp. 143–44.

34. Without access to the documents, FWR was unable to move forward on the IND project. Tr., 9/19/94, p. 144.

35. FWR lost its license in August of 1994. Tr., 9/19/94, p. 55.

36. Over the course of his employment, FWR paid Dr. Tannen $86,333.30 in salary. Plaintiff's Ex. 28.

37. FWR paid $87,838.66 to various contractors hired by Dr. Tannen in connection with the IND application. Plaintiff's Ex. 28.

38. FWR refused to reimburse Dr. Tannen for a phone bill in the amount of $360.80. Tr., 11/15/94, p. 218.

## DISCUSSION

### I. *BREACH OF CONTRACT*

#### A. *Terms of the Agreement*

Both parties allege to have suffered damages as a result of the other's breach of the employment contract. The parties have stipulated that a contract existed between them, but since they failed to commit their agreement to writing, we must first determine the specific terms of the contract before reaching the issue of breach. The parties hold disparate views as to the substance of the contract. For example, Dr. Tannen contends that he was promised (1) a 2% share in FWR, (2) that he would remain on the payroll until the IND was filed and for two years afterward, and (3) that $2.5 million would be available to complete the IND. On the other hand, FWR argues that Dr. Tannen would be eligible to receive stock only after the IND had been filed, and that the April 15 deadline date was incorporated into the contract.

The court's task in construing a contract is to give effect to the intent of the parties. *Marine Midland Realty Credit Corp. v. LLMD of Michigan, Inc.*, 821 F.Supp. 370, 373 (E.D.Pa.1993). In cases such as this, where the contract at issue is an oral one, "the meaning must be interpreted with reference to the circumstances under which the parties contracted in light of the objectives to be accomplished." *Boyle v. Steiman*, 429 Pa.Super. 1, 631 A.2d 1025, 1033 (1993), *appeal denied*, 538 Pa. 663, 649 A.2d 666 (1994) (citing *McCormack v. Jermyn*, 351 Pa. 161, 166, 40 A.2d 477, 480 (1945)). In the absence of clear terms, a court may ascertain intent by examining the surrounding circumstances, the course of dealing, and the method of performance. *Dahar v. Grzandziel*, 410 Pa.Super. 85, 599 A.2d 217, 221 (1991); *Greene v. Oliver Realty, Inc.*, 363 Pa.Super. 534, 526 A.2d 1192, 1194, *appeal denied*, 517 Pa. 607, 536 A.2d 1331 (1987).

Here, the clearest indication of the parties' intent regarding the terms of the agreement is the June 4, 1992 letter from Mr. Pendleton to Dr. Tannen following their meeting. *See* Finding of Fact No. 13. The letter specifically spells out the terms of FWR's "offer" as

follows: (1) Dr. Tannen was to be hired in a consultative capacity "in the area of IND preparation and filing;" (2) Dr. Tannen was to be compensated at a rate of $8,333.33 per month, and was to be reimbursed "for all approved out-of-pocket expenses;" (3) Dr. Tannen would be able to participate in the stock option program only if the IND were successfully filed and the parties mutually agreed to continue a relationship.

■ Dr. Tannen commenced working for FWR soon after receiving the letter. Moreover, he failed to voice any objections regarding the terms of his employment with Mr. Pendleton. Thus, we conclude that the terms set forth in the letter are generally the ones to which the parties intended to agree. As a result, we also conclude that the agreement did not include a present right to equity in the company. Any entitlement to stock, as Dr. Tannen himself conceded at trial,[1] was triggered only after the IND application had been filed. Since the application was never filed, Dr. Tannen never acquired a right to stock. Further, the evidence presented does not support Dr. Tannen's conclusion that the agreement called for his employment for the two years after FWR acquired the IND (the clinical phase of the drug's development). We find that Dr. Tannen's continued employment was likewise contingent on the acquisition of the IND. Indeed, since the project could not advance to the clinical phase in the absence of an IND, and since the company's reason for being was the development of flausterone, a promise to extend Dr. Tannen's employment into the clinical phase made prior to the IND acquisition would have made little sense. Accordingly, to the extent Dr. Tannen argues that FWR breached the contract either by not providing him with stock or terminating him prior to the clinical phase, such argument must be rejected.[2]

FWR argues that the contract provided for the timely completion and filing of the IND application. Specifically, Mr. Pendleton testified that he notified Dr. Tannen of the April 15, 1993 deadline at their meeting in May of 1992, and that Dr. Tannen assured him that he could complete the IND application within six months. This version of the events is corroborated by Mr. Pendleton's June 4 letter, in which he informs Dr. Tannen that the term of his employment would be six months, representing the time in which Dr. Tannen promised to complete the IND application. Moreover, the evidence suggests that Mr. Pendleton raised the impending deadline repeatedly at progress meetings, reminding Dr. Tannen that the future of the project depended upon the timely filing of the IND application. In this way, the course of performance also highlights the importance of the IND application filing deadline date. The Court therefore concludes, in light of the importance of the deadline date, the testimony of Mr. Pendleton, and the corroborating letter, that the contract called for Dr. Tannen to complete the IND application within six months, or at the latest, by April 15, 1993.

■ We find that a professional services contract existed between FWR and Dr. Tannen. Pursuant to that contract, Dr. Tannen was to (1) prepare and file an IND application and (2) do so within six months, or by April 15, 1993. In return, FWR agreed to (1) pay him $8,333.33 per month; (2) reimburse him for all of his expenses related to the filing of the IND; (3) provide him with the necessary resources to complete the job; and (4) award him stock and consider him for a permanent position once FWR acquired the IND. We conclude that FWR has met its contractual duties. When Dr. Tannen indicated that he would be unable to complete the IND until August of 1993, however, he

---

1. From Dr. Tannen's direct testimony:
 Q. But when was your stock supposed to kick in, prior to your even filing an IND or after you filed an IND?
 A. At the point of getting the IND, was my understanding.
 Tr., 11/15/94, p. 203.

2. Moreover, we note that Dr. Tannen is precluded from bringing an action in contract based

upon FWR's conduct in breach of the agreement that occurred after Dr. Tannen himself breached the contract. *See Tyro Indus., Inc. v. Trevose Constr. Co., Inc.,* 737 F.Supp. 856, 864 (E.D.Pa. 1990) (material breach discharges non-breaching party from obligations under the agreement). Accordingly, Dr. Tannen's argument that FWR breached the agreement by refusing to reimburse him for his phone expenses must be rejected.

failed to honor his obligation under the agreement. Thus, he is liable for the resulting damages.

### B. *Dr. Tannen's Defenses*

Dr. Tannen offers two arguments in an attempt to provide legal justification for his inability to perform. We now address those arguments.

#### 1. *Substantial Performance*

■ Dr. Tannen first invokes the doctrine of substantial performance, and argues that since the extent of his non-performance was "trivial," we "must find that a breach of contract has not occurred." Defendant's Brief at 27. In Pennsylvania, the substantial performance doctrine is available to those who competently perform in all material respects. Thus,

> [t]he equitable doctrine of substantial performance is intended for the protection and relief of those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects.

*Mort Co. v. Paul,* 167 Pa.Super. 532, 534–35, 76 A.2d 445, 447 (1950). Upon review of the evidence presented, we conclude that Dr. Tannen has failed to demonstrate that he has substantially performed his obligation. Indeed, the evidence shows that he was hired for the specific purpose of preparing an IND application, and that he not only failed to do so, but also failed even to initiate the majority of tasks associated with the filing of an IND application. Moreover, Dr. Tannen indicated in his final progress report, submitted in March of 1993, that he would not be able to complete the application until August. Such evidence leads us to conclude that Dr. Tannen has failed to perform in material respects. As a result, we reject Dr. Tannen's substantial performance defense.

#### 2. *Frustration of Purpose*

Dr. Tannen also submits that the doctrine of frustration of purpose is applicable to the instant case, arguing that FWR failed to provide him with the necessary resources to complete the IND application. Courts in Pennsylvania have adopted § 261 of the Restatement (Second) of Contracts, which provides as follows:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 261 (1979) (quoted in *Luber v. Luber,* 418 Pa.Super. 542, 614 A.2d 771, 774 (1992), *appeal denied,* 535 Pa. 636, 631 A.2d 1008 (1993); *Madreperla v. Williard Co.,* 606 F.Supp. 874, 878 (E.D.Pa.1985)). Thus, Dr. Tannen contends that his duty to perform was discharged by FWR's inability to provide for funding sufficient to complete the IND application.

■ Upon review of the evidence presented at trial, however, we conclude that the issue of funding did not render impossible Dr. Tannen's ability to perform. Dr. Tannen points to testimony in which Dr. Schwartz offers his opinion that the project was not adequately funded, as follows:

> Q. And I had asked you if you complained about the way Kirk Pendleton managed the company. What was the nature of your complaints?
>
> A. That we lost a great deal with the company. That we had not been adequately funded. We really should have been way ahead of where we were at that time.
>
> . . . . .
>
> Q. Why was [the IND application not filed]?
>
> A. As far as I can tell, inadequate funding. The thrust simply was not there. The funding and the—what we needed to just move ahead simply was not there.

Tr., 11/14/94, pp. 71–72. This testimony, however, is contradicted by that of Mr. Pendleton, the FWR player closest to the funding situation, who repeatedly testified that every IND–related expenditure was funded.

Tr., 9/20/94, pp. 114–18. Moreover, Dr. Tannen does not point to any evidence suggesting that an IND-related expenditure was denied, or that FWR's rejection of a certain funding request prevented the timely submission of the IND application. Finally, we note that much of the testimony relating to funding issue concerns the project as a whole, while the scope of Dr. Tannen's relationship with FWR was limited to the filing of the IND application. We therefore find that the resources needed to complete the IND application were available to Dr. Tannen, and as a result, we conclude that his frustration of purpose defense is without adequate support in the record, and must be rejected.

## II. *FWR'S NEGLIGENT PERFORMANCE OF A PROFESSIONAL DUTY CLAIM*

 Under Pennsylvania law, a professional "'is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.'" *Robert Wooler Co. v. Fidelity Bank,* 330 Pa.Super. 523, 531, 479 A.2d 1027, 1031 (1984) (quoting Restatement (Second) of Torts § 299A); *see Bloomsburg Mills, Inc. v. Sordoni Constr. Co.,* 401 Pa. 358, 361–62, 164 A.2d 201, 203 (1960) (architect must use reasonable and ordinary care in carrying out task for which he was retained). FWR contends that Dr. Tannen was bound by such a duty, and that he breached it by (1) failing to evaluate the situation at the outset, in order to determine the extent of the remaining required work; (2) failing to develop and execute a plan to complete the IND application; and (3) repeatedly assuring FWR that the IND application would be filed on time. In defending this claim, Dr. Tannen argues not that the standard should not be applied to him, but that he executed his duties with reasonable care.

 The evidence compels the opposite conclusion. First, we note that Dr. Tannen held himself out as one who was capable in the area of IND preparation and filing, and that Mr. Pendleton relied upon Dr. Tannen's purported expertise when he brought Dr. Tannen onto the project. Over the course of the nine months of his engagement, however, Dr. Tannen demonstrated that he was unfit for the task. Indeed, the evidence reveals that Dr. Tannen never assessed the existing data so as to determine the steps that were required to complete the IND application. According to Hanni Ellis, an expert witness whose firm has filed approximately 80 INDs over the five years prior to trial, all of which have been approved by the FDA, Dr. Tannen should have, at a very early stage, achieved the preparation of the investigational dosage form so that stability studies could be conducted in support of the early clinical trials. Dr. Tannen failed to take these steps, and generally failed to attack his task in the manner of a reasonable and prudent consultant in the IND-filing area. Accordingly, we conclude that he carried out his duty in negligent manner, and therefore that he is liable to FWR for the resulting damages.

## III. *DR. TANNEN'S REMAINING CLAIMS*

As we noted previously, Dr. Tannen has submitted, in addition to the breach of contract counterclaim disposed of above, counterclaims under the theories of liability of fraudulent and negligent misrepresentation and defamation. We now turn to address those claims.

### A. *Misrepresentation Theory*

 Under the law of Pennsylvania, if Dr. Tannen is to prevail under either a negligent or fraudulent misrepresentation theory, he must show, *inter alia,* that he was supplied with false information, that he justifiably relied on the information, and that he suffered pecuniary loss as a proximate result. *Browne v. Maxfield,* 663 F.Supp. 1193, 1202 (E.D.Pa.1987). Dr. Tannen's fraudulent and negligent misrepresentation claims arise from three alleged misstatements and material omissions: (1) Mr. Pendleton's assurance that $2.5 million was available for the project; (2) Mr. Pendleton's failure to inform Dr. Tannen that the task of completing the IND application was more than just an "assembly job;" and (3) Mr. Pendleton's failure to inform Dr. Tannen of the April 15, 1993 deadline. Dr. Tannen asserts that he would not

have accepted FWR's offer were it not for these representations, and that he would have been able to complete the IND application if the representations were true. As a result of these representations, Dr. Tannen claims to have lost income from a continued relationship with FWR, an opportunity for stock ownership, and income from a consulting business he hoped to launch from the momentum of the FWR project. Before proceeding, we note our factual conclusion that Dr. Tannen was made aware of the April 15 deadline; thus, he cannot base his claims on that representation. Accordingly, our inquiry will focus on the remaining alleged misrepresentations.

With respect to the alleged misstatement regarding the availability of $2.5 million, the overriding difficulty we have with Dr. Tannen's argument concerns the statement's materiality. As we have concluded, Dr. Tannen was hired specifically to complete and file the IND application. The $2.5 million figure, on the other hand, referred to the level of funding available to take the project beyond the IND phase and into the clinical phase. Thus, the representation regarding the $2.5 million could not have reasonably induced Dr. Tannen to accept FWR's offer, because the information concerned an issue that exceeded the scope of Dr. Tannen's employment. Moreover, we are not convinced that the representation was untrue. While Dr. Tannen has introduced bank statements and tax returns which show that FWR did not have that level of funding on hand, Mr. Pendleton testified persuasively that money was raised on an as-needed basis, and that investors were standing ready to fund the project to the $2.5 million level, if required. Tr., 9/20/42, pp. 65–67.

Likewise, we hold that Dr. Tannen cannot recover under a misrepresentation theory on the basis of Mr. Pendleton's failure to inform him that more than mere assembly was required. The difficulty here is Dr. Tannen's own testimony, in which he asserts that he discovered that the job required more than assembly in October, four months after he joined the project. First, we wonder why four months had elapsed before Dr. Tannen was able to grasp the scope of his task. In

any event, the time and event schedule Dr. Tannen submitted in October listed March as the date on which the IND application would be filed. Thus, even if we assume that Dr. Tannen was mislead as to the scope of the assignment, and that he did not achieve a complete understanding of the task until four months after joining FWR, he still represented to FWR that he would be able to complete the job before the deadline date. Accordingly, we conclude that the representation at issue did not cause the non-filing of the IND application and Dr. Tannen's subsequent termination, and as a result, it cannot be the basis for the claim. For these reasons, we must reject Dr. Tannen's bid to recover under a misrepresentation theory.

### B. *Defamation*

Dr. Tannen's defamation claim can be disposed of in short order. The claim is based upon statements made by Mr. Pendleton to FWR shareholders to the effect that (1) Dr. Tannen wrongfully converted documents and (2) the IND was not filed in a timely fashion due to Dr. Tannen's "professional inaptitude." In our Memorandum and Order disposing of the parties' motions for summary judgment, we concluded Dr. Tannen did indeed wrongfully convert IND-related documents. Thus, since truth is an absolute defense to a defamation action under Pennsylvania law, *Krochalis v. Insurance Co. of N. Am.*, 629 F.Supp. 1360, 1365 (E.D.Pa. 1985), we rejected the claim to the extent it was based on Mr. Pendleton's statement concerning the conversion issue. *Tannen*, 846 F.Supp. 354, 365 (E.D.Pa.1994). We have concluded today that Dr. Tannen was justifiably discharged due to his inability to complete the IND application in a timely manner. Accordingly, we hold that FWR and Mr. Pendleton have an absolute defense to the defamation claim.

### IV. *DAMAGES*

We have concluded that Dr. Tannen is liable to FWR not only under contract theory, but also under the theories of conversion and negligent performance of a professional

duty.[3] Conversely, we have found that all of Dr. Tannen's counterclaims must fail. Accordingly, we turn now to address the issue of damages.

### A. Contract Damages

■ FWR seeks the following damages: (1) $86,333.33 in salary it paid Dr. Tannen; (2) $87,838.66 in fees to subcontractors hired to complete IND-related work; (3) $350,000 in reimbursement for licensing fees it paid during the course of Dr. Tannen's employment and for the time during which he unlawfully possessed the IND-related documents; (4) loss of the licensing agreement, valued at $2 million; (5) loss of the profits it would have realized had the IND application been filed; and (6) attorney's fees and costs. Under Pennsylvania law, courts generally award damages to the non-breaching party so as to place it in the economic position it would have occupied had the contract been performed. *Bellefonte Area School Dist. v. Lipner*, 81 Pa.Cmwlth. 334, 473 A.2d 741, 744 (1984).

■ However, Pennsylvania law does not provide for the recovery of prospective profits of a new business, since such damages are by nature speculative and elude a reasonably certain estimation. *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 14 Pa.D. & C.2d 459, 466, *aff'd*, 394 Pa. 124, 145 A.2d 672 (1958). Moreover, Pennsylvania law draws a distinction between general damages—those ordinary damages that flow directly from the breach; and special or consequential damages—those collateral losses, such as expenses incurred or gains prevented, which result from the breach. *Ebasco Services, Inc. v. Pennsylvania Power & Light Co.*, 460 F.Supp. 163, 213 n. 62 (E.D.Pa.1978). Generally, a breaching party is liable only for those ordinary damages that would naturally result from the breach, and is liable for the consequential damages only if "it is shown specifically that the defendant had reason to know of the circumstances responsible for

the special damage and to foresee the injury." *Id.* (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng.Rep. 145 (1854)). Thus, to recover consequential damages, a plaintiff must show that at the time the contract was entered, "the damages subsequently claimed were in the reasonable contemplation of the parties." *Keystone Diesel Engine Co. v. Irwin*, 411 Pa. 222, 225, 191 A.2d 376, 378 (1963).

■ In the instant case, as we have discussed, FWR hired Dr. Tannen to complete the IND application, and paid him a salary of $86,333.33 in the vain hope that such an application would be filed in a timely fashion. Since Dr. Tannen breached the agreement by failing to complete the IND application, FWR is entitled to compensation for the funds it expended in pursuit of a finished product. With respect to the funds it paid to subcontractors for IND-related work, as well as the losses of the licensing fees and the licensing agreement, however, we conclude that since there is no indication that these damages were within the contemplation of the parties at the time the contract was executed, Dr. Tannen cannot be held liable for them. Dr. Tannen was hired to complete the IND application, and not as guarantor of the success of the entire project. Moreover, since FWR reacquired possession of the converted documents in April, 1994 and retained the license until August of that year, we are unconvinced that FWR has demonstrated a causal nexus between Dr. Tannen's performance under the contract and the loss of the license. Likewise, FWR has failed to demonstrate that it merits an award of attorney's fees and costs. *See Bakery & Confectionery Workers' Int'l Union v. Local 464*, 84 Dauph. 301 (Pa.Com.Pl.1966) (attorney's fees and costs not generally recoverable in contract or tort action, especially in the absence of malicious conduct). Accordingly, we will award $86,333.33 in contract damages to FWR.

---

**3.** Dr. Tannen is liable for the harm caused by his negligence. Since that negligence is defined by his breach of the contract and his conversion of the IND–related documents, we conclude that the damages covered under the other theories of liability adequately compensate FWR for its loss. Accordingly, we will examine the damages to which FWR is entitled under contract and conversion theories.

### B. *Conversion Damages*

 A prevailing plaintiff in a conversion action is entitled to damages "for all actual losses or injuries sustained as a natural and proximate result of the converter's wrong." *American East India Corp. v. Ideal Shoe Co.*, 400 F.Supp. 141, 169 (E.D.Pa. 1975), *aff'd without op.*, 568 F.2d 768 (3d Cir.1978). Generally, this amount translates to the value of the converted property at the time of the conversion. *Baram v. Farugia*, 606 F.2d 42, 44 (3d Cir.1979); *Federal Ins. Co. v. Ayers*, 772 F.Supp. 1503, 1510 (E.D.Pa. 1991). The court's over-arching task, however, is to compensate the plaintiff for the defendant's wrong, fitting the remedy to the particular circumstances of the case. *American East India*, 400 F.Supp. at 169.

 The evidence presented in this case reveals that Dr. Tannen unlawfully possessed the IND-related material for twelve months, before possession of the material was restored to FWR. During that period of time, FWR was essentially incapable of proceeding with the IND application project, as it was unable either to assess its status or to identify the necessary corrective steps. The evidence further shows that FWR regained possession of the material in April, 1994, and did not lose its license with RTC until August of that year. Thus, we conclude that Dr. Tannen's unlawful conversion was only partially responsible for FWR's failure to file the IND application. Accordingly, we will award damages to FWR in the amount of $50,000 to compensate it for Dr. Tannen's conversion.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are of diverse citizenship and the amount in controversy exceeds $50,000.

2. By a preponderance of the evidence, FWR demonstrated that Dr. Tannen breached the contract at issue when he failed to complete the IND application by the April 15, 1993 deadline date.

A. Dr. Tannen did not substantially perform under the contract.

B. FWR's conduct did not render Dr. Tannen's ability to perform impracticable.

3. By a preponderance of the evidence, FWR demonstrated that Dr. Tannen breached his duty to perform with reasonable care.

4. FWR further demonstrated that it incurred damages in the amount of $86,333.33 as a result.

5. FWR incurred damages in the amount of $50,000 as a result of Dr. Tannen's conversion of the IND-related documents.

6. Accordingly, Dr. Tannen is liable to FWR for $136,333.33.

7. Dr. Tannen failed to show that FWR is liable to him under the theories of breach of contract, fraudulent misrepresentation, negligent misrepresentation, or defamation.

An appropriate order follows.

### ORDER

AND NOW, this 5th day of October, 1995, following a non-jury trial in this matter and careful consideration of the parties' proposed findings of fact and conclusions of law, and for the reasons set for in the preceding Decision, it is hereby ORDERED that:

1. VERDICT and JUDGMENT are entered in favor of Plaintiff in the total amount of $136,333.33 on counts of (1) breach of contract; (2) negligent performance of a professional duty; and (3) conversion.

2. VERDICT and JUDGMENT are entered in favor of Counterclaim Defendants in no amount on all counts of Defendant's Counterclaim.